PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 16-1924 and 16-2164
_____

JEFFREY M. NORMAN,
                    Appellant in No. 16-1924

v.

DAVID W. ELKIN; RICHARD M. SHORIN;
ELKIN GROUP INC.; US MOBILCOMM INC.
                    Appellants in No. 16-2164
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-06-cv-00005)
District Judge:  Hon. Leonard P. Stark
_____

Argued
January 13, 2017

Before:  SMITH, *Chief Judge*, JORDAN, and SHWARTZ,
*Circuit Judges*.

(Filed: June 13, 2017)
_____

David A. Felice (Argued)
Bailey & Glasser
2961 Centerville Rd.
Suite 302
Wilmington, DE   19808
       *Counsel for Appellant/Cross-Appellee*

Steven L. Caponi (Argued)
David A. Dorey
Adam V. Orlacchio
Blank Rome
1201 Market St.
Suite 800
Wilmington, DE  19801
       *Counsel for Appellees/Cross-Appellants*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*

Jeffrey Norman and David Elkin were the only two shareholders of US MobilComm Inc. ("USM"), a Delaware company that acquired and sold rights to radio frequencies. Norman held a minority interest and sought legal relief after he discovered that Elkin had transferred to another company the ownership of several frequencies purchased by USM, that Elkin had treated capital contributions as loans, and that Elkin had paid himself from USM funds without giving Norman any return on his minority investment. It was the beginning of a long and tortuous litigation trail. Despite two juries having sided with Norman, the verdicts in his favor were

overturned. Most of his claims were ultimately held to be barred by the statute of limitations, after the District Court rejected his argument that a state court case he had brought to inspect USM's books and records pursuant to § 220 of Title 8 of the Delaware Code tolled the statute of limitations. Other claims were eliminated for insufficient evidence. Norman now appeals, seeking to restore portions of each of the two jury verdicts he won and also to allow him to pursue certain claims that had been foreclosed by the District Court. Elkin cross-appeals and asks us to affirm on alternative grounds the several rulings rejecting Norman's claims.

We conclude that the District Court erred in concluding that tolling of the statute of limitations is categorically inappropriate when a plaintiff has inquiry notice before initiating a books and records action in the Delaware courts. Accordingly, we will send most of the claims back to the District Court to determine whether tolling should have applied and, if so, whether any of the claims are nevertheless time-barred. We also conclude that the District Court erred when it vacated the jury's award of nominal damages for one of Norman's breach of contract claims. Finally, we hold that Norman's fraud claim was not supported by sufficient proof of damages and we thus affirm judgment as a matter of law on that claim on the alternative grounds that Elkin has proposed.

3

## I. FACTUAL BACKGROUND[1]

In the early 1990s, the FCC announced plans to grant licenses for the commercialization of 220 megahertz ("MHz") radio frequencies. Those frequencies had previously been available only for non-commercial purposes, so entrepreneurs anticipated that the newly available frequencies would create lucrative business opportunities. Such ambitions were frustrated, however, by technological failures and regulatory logjams, and investor hopes eventually turned to disappointment. This case is a consequence of the bursting of the 220 MHz bubble.

### A. *The Auction and Sale of Frequencies*

Norman and Elkin founded USM in order to acquire, develop, and sell licenses to 220 MHz frequencies. In 1991-92, the FCC granted the first wave (Phase I) of 220 MHz licenses by lottery. Norman's primary responsibility at USM was to acquire, aggregate, and manage licenses held by individual Phase I license holders throughout the country. By 1996, USM had successfully acquired around 40-50 licenses and entered into agreements to manage over 150 more. At that point, Norman's involvement in the day-to-day business affairs of USM ceased. Elkin, by contrast, continued to manage the company.

---

[1] Because Norman's claims were dismissed pursuant to Elkin's post-trial motions for judgment as a matter of law, we must "view[] the evidence in the light most favorable to [Norman] and giv[e] [him] the advantage of every fair and reasonable inference[.]" *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).

4

In 1998, the FCC began the second phase of licensing through a competitive auction. Elkin registered USM for the auction and USM won the rights to several frequencies. Those rights were subsequently registered in the name of another company that Elkin owned, The Elkin Group ("TEG"). According to Elkin, the involvement of TEG was necessary because USM did not have the funds to participate in the auction or bid on any of the licenses without TEG's assistance. Elkin also said he wanted to make sure that a friendly corporation acquired the licenses that overlapped with those already owned by USM. *Norman v. Elkin* ("*Norman I*"), CIV. A. No. 06-005, 2007 WL 2822798, at *2 (D. Del. Sept. 26, 2007).

Norman closely monitored the FCC's bidding process and, a few days after the auction, he e-mailed Elkin asking for more information about the auction results. He also called the FCC to inquire into the status of USM's licenses acquired through the second phase auction. Some FCC notices referred to USM as the winning bidder, while other public documents referred to TEG as the owner of the licenses.

### B. Capitalization and the Shareholder Loan Agreement

Norman owns 25% of the stock of USM and Elkin owns 75%. When they founded USM, they entered into an oral agreement to invest a proportional share of capital in the company to meet a million dollar capital requirement – Norman promised to invest $250,000 while Elkin promised to invest $750,000. Despite those promises, disputes over contributions quickly arose. Norman allegedly only contributed $200,000 of his $250,000 obligation. Elkin also

5

failed to make his full capital contribution; he initially furnished around $360,000. Further complicating what was supposed to be a straightforward capitalization story, Elkin and Richard Shorin, the Assistant Secretary of USM, felt that Norman had spent USM's funds on personal matters and so, at Elkin's direction, USM treated those expenditures as capital outlays and reduced Norman's capital contribution to approximately $140,000.

Elkin claimed to believe that he was only required to maintain a capital contribution proportional to Norman's contribution. So he reduced his own contribution target to $420,000. He did that by causing USM to enter into a "Shareholder Loan Agreement" sometime between 1995 and 2002. Consistent with that document, USM agreed to treat any amount that Elkin contributed to the company above $420,000 as a loan.[2] Subsequently, Elkin gave additional sums to keep USM afloat, and a document listing all of Elkin's purported loans (the "Shareholder Loan Schedule") showed that Elkin had loaned USM more than $690,000, including certain capital contributions that were converted into loans.

In 2000 and 2001, USM sold off its Phase I licenses. It prioritized repayment of Elkin's loans and paid him $615,026, without giving Norman any money. One of the

---

[2] The Shareholder Loan Agreement itself is dated September 1, 1995, but Elkin could not recall exactly when he entered into the Agreement, and at trial he testified that it was agreed to in 1997 and executed in 2000. Other trial documents provide conflicting dates. The actual date is not relevant to this appeal.

key issues in this case is when Norman knew or should have known about those payments. He received federal income tax K-1 forms from USM each year, and in 2000 and 2001 the forms declared that USM had realized a capital gain. Those K-1 forms did not state what had been sold, and they did not list any shareholder loans or distributions. However, in a deposition, Norman admitted that "a capital gain, by definition … has to be sale of a license[.]" (App. at 512.)

In the summer of 2002, Norman and Elkin had a telephone conversation, after not having spoken in a long time. Elkin said that some licenses had been sold. Norman described the call as follows:

> I logged a call into him and said: Hey, what is going on with the company? And he was a little bit evasive as I recall. And then I pointedly asked him: Has anything been sold? And he said: Yes. And I said: Well, what? And he goes: Well, we sold some licenses. And I forget the cities he even said.
>
> I said: Well, did you take a distribution? And he said: Yeah. I said: Well, you know, what about me basically? And he said: Oh, it wasn't your turn.

(App. at 860-61.) Norman asked for additional information, which Elkin never sent. Later, on October 2, 2002, Norman's attorney sent a letter (the "October 2002 Letter") requesting

7

information pursuant to 8 Del. C. § 220.[3]  Specifically, the letter requested information regarding "the sale or other disposition of any assets or stock of [USM] over the past three (3) years, and the distribution or use of any proceeds of any such sales or dispositions."  (App. at 228.)

Approximately two months passed and, on December 3, 2002, Norman received a letter (the "December 2002 Letter") from Elkin acknowledging that USM had sold the licenses "it owned."  (App. at 231).  The letter included purchase and sale agreements which revealed that TEG sold some of the Phase II licenses acquired during the auction. The letter also included a breakdown of the uses of the proceeds, including repayment of what were characterized as shareholder loans, but it significantly understated the amount paid to Elkin.  The Shareholder Loan Agreement was subsequently included in a letter that USM sent to Norman's attorney in October 2003 (the "October 2003 Letter") in response to a request for further information.  *Norman v. Elkin* ("*Norman II*"), 726 F. Supp. 2d 464, 472 (D. Del. 2010); (App. at 128, 131).

## II.    PROCEDURAL BACKGROUND

The in-court battles between the parties began on November 16, 2004, more than a year before the fight became a federal case.  Norman filed suit under 8 Del. C. § 220 in the

---

[3] Section 220 allows a stockholder to request inspection of the books and records of a corporation and, if his request is rebuffed, he is entitled to bring an action in the Delaware Court of Chancery to compel inspection.  8 Del. C. § 220(b)-(c).

8

Delaware Court of Chancery to compel Elkin to allow inspection of USM's books and records. Elkin vigorously opposed that proceeding and it dragged on for almost a year, until October 2, 2005, when the Chancery Court compelled USM to disclose the requested documents.[4]

Norman filed the complaint that is the foundation of this appeal on December 5, 2005. Though he filed it in the Court of Chancery, the case was, at Elkin's instigation, promptly removed to the District Court. Norman raised a wide variety of tort and contract claims against Elkin,[5] USM, and TEG (collectively, the "Defendants") including breach of contract, usurpation of corporate opportunities, conversion, fraud, breach of fiduciary duties, and unjust enrichment.[6]

---

[4] Elkin argues unconvincingly that the Chancery Court's order in the § 220 action is not part of the record in this appeal. Norman had offered the order into evidence but the order was excluded by the District Court. It is, nonetheless, part of the record. *See Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 682 (3d Cir. 2003) (explaining that the record on appeal "includes items admitted into evidence, but also includes items presented to the district court and not admitted into evidence" (quoting *Waldorf v. Shuta*, 142 F.3d 601, 620 (3d Cir. 1998))).

[5] Elkin filed counterclaims, none of which are pertinent at this point.

[6] More precisely, Norman's claims were: 1) breach of the oral contract between Norman and Elkin regarding capital contributions and equity in USM, 2) usurpation of corporate opportunities by bidding on FCC licenses for TEG rather than

With regard to his breach of contract claim, Norman alleged that he and Elkin entered into an oral contract about the amount of capital they would contribute and the equity they would each receive. Norman advanced three theories of breach: 1) that Elkin had failed to pay him his (Norman's) pro rata share of all proceeds, 2) that Elkin had refused to maintain his (Elkin's) full capital contribution of $750,000, and 3) that Elkin had improperly caused USM to enter into the Shareholder Loan Agreement.[7]

### A. Summary Judgment Opinion (Norman I)

The Defendants eventually moved for summary judgment, arguing that all of Norman's claims were barred by the statute of limitations. *Norman I*, 2007 WL 2822798, at

---

USM, 3) breach of fiduciary duty (including the duties of loyalty, care, and good faith), 4) breach of the duty of disclosure, 5) conversion and misappropriation of the Phase II licenses, 6) fraudulent misrepresentation (via the December 2002 Letter), and 7) unjust enrichment. Norman also claimed that Shorin aided and abetted Elkin's wrongful conduct, but the District Court granted Shorin summary judgment on that claim and it is not part of this appeal. *Norman v. Elkin* ("*Norman II*"), 726 F. Supp. 2d 464, 478-79 (D. Del. 2010).

[7] In his amended complaint, Norman listed four bases for his breach of contract claim. By the time of the first trial, however, Norman's position was "that Elkin breached [his] agreement in [the] three (3) distinct ways," as discussed above. (*Norman v. Elkin*, CIV. A. No. 06-005, Docket Item ("D.I.") 61 at p 3.)

\*3-4. In the course of denying that motion, the District Court made several rulings relevant to this appeal. It first determined the applicable statute of limitations. *Id.* at \*3. Since the suit was brought in Delaware, it applied Delaware's procedural law, including the state's borrowing statute, 10 Del. C. § 8121.[8] *Norman I*, 2007 WL 2822798, at \*4. On that basis, it decided that Delaware law required that Pennsylvania's two-year statute of limitations be applied to all but the breach of contract claim, since Pennsylvania's limitations period was shorter than Delaware's for those non-contract claims.[9] *Id.* For the breach of contract claim, the

---

[8] That statute provides in relevant part:

Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action.

10 Del. C. § 8121.

[9] At the time that Norman filed suit, Elkin and Shorin were both residents of Pennsylvania and TEG was incorporated in Pennsylvania. USM's principal place of business was also in Pennsylvania. Given the several connections between the dispute and Pennsylvania, the District Court concluded that, for purposes of the Delaware borrowing statute, "[t]he parties do not dispute that … the conduct underlying the causes of action arose in

11

Court applied Delaware's three-year limitations period, rather than Pennsylvania's four-year period. *Id.*

The District Court then accepted Norman's argument that the statute of limitations for all of the claims was tolled as a result of Elkin's alleged wrongdoing and concealment of facts. *Id.* at *5. Accordingly, "the statute of limitations began to run at the time [Norman] knew or had reason to know of the facts constituting the alleged wrong." *Id.* The Court emphasized that "the date on which [Norman] knew or should have known the facts constituting his claims is a material dispute of fact" and therefore concluded that the claims could not be ruled untimely at the summary judgment stage. *Id.*

### B. First Trial and Post-Trial Motions (Norman II)

Three of Norman's nine claims went to trial: breach of contract, fraud, and conversion. *Norman II*, 726 F. Supp. 2d at 468. The District Court did not allow the other claims to go to the jury and stated that it would reserve judgment as to whether any of them were viable.[10] *Id.* After a three-day

---

Pennsylvania." *Norman v. Elkin* ("*Norman I*"), CIV. A. No. 06-005, 2007 WL 2822798, at *4 (D. Del. Sept. 26, 2007). That conclusion has not been challenged on appeal.

[10] The District Court stated that it was "going to reserve for post-trial briefing the question of whether the [other] claims … [were] direct or derivative in nature." (D.I. 129 at p. 2-3.) However, after trial the Court dismissed the other claims solely on the basis of the statute of limitations. *Norman II*, 726 F. Supp. 2d at 468-76. Federal Rule of Civil

trial, the jury returned a verdict for Norman and awarded him $105,756 in compensatory damages and $48,000 in punitive damages on the fraud claim, $38,000 in compensatory damages on the conversion claim, and $1 in nominal damages on the breach of contract claim. *Id.* The combined verdict was "equal to $1 more than [Norman's] 25% share of distributions." *Norman v. Elkin* ("*Norman III*"), 849 F. Supp. 2d 418, 421 (D. Del. 2012) (citation omitted).

In post-trial motions, Elkin once again argued that Norman's claims were barred by the statute of limitations. *Norman II*, 726 F. Supp. 2d at 469. The District Court agreed with that argument with regard to all claims except for the breach of contract claim. *Id.* at 468-76. It held that two of Norman's three breach of contract theories were not barred – the one dealing with Elkin's failure to make pro rata distributions, and the other with the creation of the Shareholder Loan Agreement. *Id.* at 471, 479. But the Court decided that the breach of contract theory based on Elkin's failure to provide his promised capital contribution was time-barred because Norman had been aware of that failure since 1995.[11] *Id.* at 471.

---

Procedure 50(b) notes that a post-trial motion for judgment as a matter of law may "address[] a jury issue not decided by a verdict" and that the Court may "decid[e] the legal questions raised by the motion."

[11] In his complaint, Norman framed a single breach of contract claim, but the verdict form used at the first trial asked the jury to state, for each of Norman's three theories of breach, whether Elkin had breached the alleged contract dealing with capital contributions and equity ownership. The

13

For the theory of breach based on the pro rata distribution, the Court concluded, "based on the evidence adduced at trial, that [Norman] did not learn of [the] … purported recharacterization of Defendant Elkin's equity contributions into shareholder loans … until October 2003." *Id.* Consequently, that theory of breach was held to be timely asserted. *Id.*

For the theory of breach based on the Shareholder Loan Agreement, the Court noted that Elkin had not raised a statute of limitations defense. *Id.* at 476. The Court also rejected Elkin's argument that the breach of contract theory based on the Shareholder Loan Agreement was merely duplicative of the other breach of contract theories, concluding that there was sufficient evidence "on which the jury could have concluded that an agreement between [Norman] and [Elkin] existed for [Elkin] to contribute

_____

form then asked the jury to reach a single sum to compensate Norman for all of the damages he suffered due to a breach under any of the three theories. In contrast, the verdict form used at the second trial treated the two remaining breach of contract theories as if they were separate claims. That form asked the jury to decide whether the execution of the Shareholder Loan Agreement constituted a breach of Elkin's oral contract with Norman, and asked the jury to determine damages. It then asked the jury about the failure to make pro rata distributions and asked the jury to list a separate damages amount. In his post-trial motion after the second trial, Elkin argued that the District Court erred in allowing the jury to consider two separate claims when the amended complaint had only one. As discussed further herein, we conclude that Norman was entitled to present two claims to the jury.

14

$750,000 in capital, and that [Elkin] breached that agreement when he executed the Shareholder Loan Agreement to convert any funds in excess of $420,000 from capital to loans." *Id.* at 477.

The Court ruled that the fraud claim was time-barred because Norman had been on notice of the alleged fraud no later than when he received the October 2003 Letter, which was outside the two year limitations period. *Id.* at 472. The conversion claim was also barred either because "the existence of publicly available information concerning [TEG's] purported ownership demonstrates that [Norman] was not incapable of learning the facts giving rise to his conversion and usurpation claims until the § 220 Action," or because of the December 2002 Letter. *Id.* at 473. Norman's other claims were held to be time-barred on the basis of a combination of the December 2002 Letter and the October 2003 Letter, which, the District Court concluded, put him on inquiry notice. *Id.* at 470-76. The Court rejected Norman's argument that the statute of limitations should have been tolled when he filed his § 220 action in November 2004. *Id.* at 470-73. As the Court saw it, inquiry notice existed before that action was filed and so § 220 could not be a basis for tolling. *Id.* at 472.

In short, the District Court affirmed the jury's judgment only as to the breach of contract claim and the attendant nominal damages. *Id.* at 479. It therefore entered an Amended Judgment in July 2010, substantially altering the jury's verdict.

15

### C.    *Granting a New Trial (*Norman III*)*

Norman promptly moved to alter or amend the judgment or for a new trial, arguing that the jury's verdict of only $1 in damages should be vacated.[12]  The Court agreed, concluding that $1 in damages was "against the clear weight of the evidence" since the jury's verdict was plainly predicated on a finding that Norman did not receive his pro rata share of the proceeds from the sale of USM's assets. *Norman III*, 849 F. Supp. 2d at 424.  A new trial was thus ordered "limited exclusively to the issue of appropriate damages for the breach of contract claim."  *Id.* at 425.  Elkin responded with a motion for reconsideration, challenging the limited scope of the new trial.  The District Court then changed its order and granted a new trial on the merits of the breach of contract claim because, the Court concluded, there were disputed issues of material fact that remained.  The Court also ruled that the statute of limitations could once again be raised as a defense.

### D.    *Second Trial and Post-Trial Motions (*Norman IV*)*

The second jury trial was held in December 2014, and the result was again a verdict in Norman's favor.  The jury awarded him nominal damages for Elkin's breach of contract arising from the recharacterization of capital pursuant to the Shareholder Loan Agreement, and $73,180.17 for Elkin's breach of contract for failing to distribute proceeds from the

---

[12] At this point in the proceedings, the District Judge who had been handling the case retired and the matter was reassigned.

16

license sales in a pro rata fashion. The verdict was equal to a pro rata portion of the amount that Elkin received from USM, minus Elkin's claimed loans to USM in excess of $750,000.

The parties again filed a variety of post-trial motions. Elkin argued that no damages arose as a result of "the mere act of executing the Shareholder Loan Agreement[.]" *Norman v. Elkin* ("*Norman IV*"), CIV. A. No. 06-005, 2015 WL 4886049, at *2 (D. Del. Aug. 14, 2015). The District Court agreed and noted that "Norman's counsel conceded that he did not present evidence that Norman was damaged by the execution of the [Shareholder Loan Agreement], independent of the alleged derivative damages resulting from execution of the Agreement." *Id.* By "derivative damages," the Court apparently meant the failure to pay Norman a pro rata share from the sale of licenses because the Shareholder Loan Agreement had reclassified some of Elkin's capital contributions as loans. The claim of breach based on the Shareholder Loan Agreement was, in other words, viewed by the Court as duplicative of the other remaining breach of contract claim. The Court accordingly entered judgment in favor of Elkin on the Shareholder Loan Agreement claim.

Elkin also argued once again that the statute of limitations barred the breach of contract claim that was based on the failure to make pro rata distributions. *Id.* This time, the Court agreed. *Id.* It reconsidered its prior ruling on this point because, it said, the evidence presented in the second trial filled an "evidentiary hole" from the first trial. *Id.* The Court concluded that "[t]he evidence now in the record shows that a reasonable person in Norman's position would have had inquiry notice of his claims before December 2, 2002." *Id.* at *3. In reaching that conclusion, the District Court

17

relied on several things: the tax documents (i.e., the K-1's) that Norman received in 2001 and 2002, the summer 2002 phone call during which Elkin admitted to taking a distribution, and the fact that, in the October 2002 Letter, Norman and his attorney requested additional information about sales and distributions. *Id.* Under those circumstances, the Court decided, "a person would know enough to put him on notice that he should undertake further inquiry, in order to determine if a wrong had been committed against him." *Id.* Accordingly, the District Court vacated the jury's verdict and entered a final judgment in Elkin's favor. Norman appealed. So did Elkin, focusing on the sufficiency of the evidence for the fraud and conversion claims.

## III. DISCUSSION[13]

### A. *Timeliness of the Claims*

On appeal, Norman challenges many of the District Court's rulings on the statute of limitations.[14] He argues that

---

[13] This case was removed from the Delaware Court of Chancery, under 28 U.S.C. § 1441, on the basis of diversity jurisdiction, 28 U.S.C. § 1332(a). We have jurisdiction pursuant to 28 U.S.C. § 1291. "We exercise plenary review of an order granting or denying a motion for judgment as a matter of law and apply the same standard as the district court." *Lightning Lube, Inc.*, 4 F.3d at 1166 (3d Cir. 1993) (citation omitted); *cf. Lake v. Arnold,* 232 F.3d 360, 365 (3d Cir. 2000) ("[P]lenary review extends to the District Court's choice and interpretation of applicable tolling principles and its conclusion that the facts prevented a tolling of the statute of limitations."). "[A]lthough the court draws all reasonable and logical inferences in the nonmovant's favor, we must affirm an order granting judgment as a matter of law if, upon review of the record, it is apparent that the verdict is not supported by legally sufficient evidence." *Lightning Lube, Inc.,* 4 F.3d at 1166. As to Elkin's sufficiency of the evidence arguments, we likewise "view[] the evidence in the light most favorable to [Norman]" and will affirm the District Court only if there "is insufficient evidence from which a jury reasonably could find liability [against Elkin]." *Id.*

[14] Norman does not challenge the judgment entered against his claim that Elkin breached his contract by failing to contribute his full capital contribution. Because that issue is

19

the Court applied the wrong statute of limitations and also that it should have tolled the limitations period. We conclude that the District Court applied the correct limitations period but that it erred by applying the wrong standard when determining whether to toll the limitations period after Norman filed his § 220 action. Accordingly, we will remand to allow reconsideration of whether the limitations period should have been tolled and whether Norman's claims are timely.

### 1. The Limitations Period for the Non-Contract Claims

Norman claims that Delaware's longer limitations period should be applied to his non-fraud claims, particularly the conversion claim, since, under what is often called the "internal affairs doctrine," Delaware law generally applies to disputes involving Delaware corporations and their shareholders. *See Citigroup Inc. v. AHW Inv. P'ship*, 140 A.3d 1125, 1135 (Del. 2016) (explaining that such disputes are "governed by the law of the state of incorporation exclusively"). According to Norman, "this would necessarily include the choice of the relevant statute of limitations." (Opening Br. at 52.)

Norman points to no case law in support of the dubious premise that the internal affairs doctrine requires the application of Delaware's statute of limitations to all claims in every case involving a Delaware-chartered corporation and

---

not preserved on appeal, it is waived. *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993).

its stockholders. We do not need to consider the full reach of the internal affairs doctrine to recognize that premise as an overreach. *See McDermott Inc. v. Lewis*, 531 A.2d 206, 214 (Del. 1987) (noting that the internal affairs doctrine extends only to "those matters which are peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders"). And, in any event, Norman has no legitimate cause for complaint about the choice of law here because the District Court *did* apply Delaware law, namely the Delaware borrowing statute, to determine that application of Pennsylvania's statute of limitations was required. *See Nat'l Iranian Oil Co. v. Mapco Int'l, Inc.*, 983 F.2d 485, 494 (3d Cir. 1992) (noting that "the traditional rule that statutes of limitations are governed by forum law has been modified by [the borrowing] statute").[15]

---

[15] The District Court observed that "[t]he parties do not dispute that the causes of action arose outside of Delaware." *Norman I*, 2007 WL 2822798, at *4. Under Delaware law, the question of where a cause of action arose is determined by reference "to Delaware's conflict of law rules." *TrustCo Bank v. Mathews*, CIV. A. No. 8374, 2015 WL 295373, at *9 (Del. Ch. Jan. 22, 2015). And for disputes involving the internal affairs of Delaware corporations, the internal affairs doctrine does indeed counsel the selection of Delaware's substantive law. *Citigroup Inc. v. AHW Inv. P'ship*, 140 A.3d 1125, 1135 (Del. 2016). Accordingly, Norman might have argued that some of his causes of action arose in Delaware rather than Pennsylvania. But he did not. He has not challenged the District Court's conclusion – evidently based on positions taken during the litigation – that his causes of action arose in Pennsylvania. Instead, he advances the separate argument that because the "internal affairs doctrine

21

Norman also argues that, because of Elkin's allegedly fraudulent self-dealing, the District Court should have forbidden Elkin from asserting a statute of limitations defense and should have instead applied the equitable doctrine of laches. In support, Norman relies on a line of authority flowing from the Delaware Supreme Court's decision in *Bovay v. H.M. Byllesby & Co.*, which held that, in cases involving corporate fiduciaries engaged in fraudulent self-dealing at the expense of the corporation, the statute of limitations for fraud claims will not necessarily apply. 38 A.2d 808, 814 (Del. 1944). We have interpreted *Bovay* to provide an exception to the applicable statute of limitations when a controlling shareholder "derive[s] personal profits from his manipulation of [a corporation] in violation of his fiduciary obligations." *Borden v. Sinskey*, 530 F.2d 478, 488 (3d Cir. 1976). In such circumstances, "the timeliness of plaintiffs' … claims [is] to be determined by the doctrine of laches." *Cantor v. Perelman*, 414 F.3d 430, 439 (3d Cir. 2005). That may be pertinent to some of Norman's claims.

But, even if the District Court should have applied laches, that would not have changed the outcome.[16] Laches

occupies the entire relationship between a fiduciary and the stockholder. … even procedural considerations are governed by Delaware law ." (Opening Br. at 51.) That argument fails for the reasons just explained.

[16] Subsequent cases have called the scope of *Bovay* into question and limited its application to particularly egregious cases. *See Halpern v. Barran*, 313 A.2d 139, 142 (Del. Ch. 1973) (noting that *Bovay* "involved particularly egregious conduct and its application has been consistently

ordinarily runs parallel to the statute of limitations, *Bovay*, 38 A.2d at 815, and extends the limitations period only when "extraordinary circumstances make it inequitable" to allow the statute of limitations to operate as a bar, *id.* (citation omitted). Delaware courts have concluded that "equity will not relieve against the bar of the statute [of limitations] in favor of a party who has been in *laches* in not using means within his power to discover the fraud." *Kahn v. Seaboard Corp.*, 625 A.2d 269, 276 (Del. Ch. 1993) (quoting *Sparks v. Farmers' Bank*, 3 Del. Ch. 274, 306 (1869)). Accordingly, "where wrongful self-dealing is alleged," a claim will not be barred until "the plaintiff … knew or had reason to know the facts alleged to give rise to the wrong." *Id.* at 276-77 (relying on *Bokat v. Getty Oil Co.*, 262 A.2d 246, 251 (Del. 1970), *disapproved of on other grounds by Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004)). That is exactly the approach the District Court took. It tolled the limitations period until Norman should have become aware of Elkin's alleged improprieties. Accordingly, there was no discernible error in its ruling on the timeliness of the non-breach of contract claims.

## 2. *Section 220 Tolling*

Delaware law, embodied in § 220 of Title 8 of the Delaware Code, allows stockholders to demand the right to inspect the books and records of a corporation and to seek an order from the Delaware Court of Chancery compelling such inspection if a demand is ignored or rebuffed. The courts of

restricted in later decisions"). We need not decide whether *Bovay* would apply here.

23

Delaware have, on several occasions, tolled the limitations period for claims of fiduciary malfeasance while a § 220 action is pending. *Sutherland v. Sutherland*, CIV. A. No. 2399, 2013 WL 2362263, at *6 n.70 (Del. Ch. May 30, 2013) (involving self-dealing); *Orloff v. Shulman*, CIV. A. No. 852, 2005 WL 3272355, at *10 (Del. Ch. Nov. 23, 2005) (involving fraud and breach of fiduciary duty); *Technicorp Intern. II, Inc. v. Johnston*, CIV. A. No. 15084, 2000 WL 713750 at *9 (Del. Ch. May 31, 2000) (involving fraudulent self-dealing). The District Court, however, concluded that a "§ 220 [a]ction will not operate to toll the statute of limitations in a situation such as this, where [Norman] had inquiry notice of his … claim before initiating the § 220 [a]ction." *Norman II*, 726 F. Supp. 2d at 472. We have never before considered the extent of tolling offered by a stockholder's resort to a § 220 action, but we are persuaded that the District Court's interpretation of Delaware law on this point was flawed.

Delaware case law does not support a categorical rule forbidding tolling when a § 220 action is filed after a plaintiff has inquiry notice. Indeed, the primary opinion relied upon by the District Court, *Technicorp International II, Inc. v. Johnston*, suggests that a § 220 action may operate to toll a limitations period even when there is inquiry notice. In that case, the Court of Chancery held that it was "settled Delaware Law" that the applicable statute of limitations "was tolled during the pendency of ... [the] § 220 … action[]." 2000 WL 713750, at *9. There is no indication in *Technicorp* that inquiry notice should necessarily vitiate tolling. To the contrary, the shareholder in that case almost certainly had inquiry notice due to a report from a forensic accounting firm, *id.* at *6, and the Chancery Court noted that pursuit of an

24

action under § 220 is "regarded as strong evidence that [a] plaintiff was aggressively asserting its claims at that time[,]" *id.* at *9 n.26 (citation and internal quotation marks omitted). So *Technicorp* cuts against the rule adopted by the District Court.

The District Court's categorical denial of tolling is also incompatible with Delaware's apparent intent to encourage § 220 actions as a way to allow stockholders to resolve disputes with the aid of a streamlined books and records proceeding. *See Cal. State Teachers' Ret. Sys. v. Alvarez*, CIV. A. No. 7455, 2017 WL 239364, at *3 (Del. Jan. 18, 2017) (noting that "Section 220 proceedings are supposed to be streamlined and summary"); *see also King v. VeriFone Holdings, Inc.*, 12 A.3d 1140, 1145 (Del. 2011) (noting that "Delaware courts have strongly encouraged stockholder-plaintiffs to utilize Section 220"). The Delaware Supreme Court has explained, in a different context, that courts should not "penaliz[e] diligent counsel who has employed [§ 220] … in a deliberate and thorough manner in preparing a complaint[.]" *Rales v. Blasband*, 634 A.2d 927, 934 n.10 (Del. 1993) (applying the "first to file" rule for derivative litigation); *see also Technicorp*, 2000 WL 713750, at *9 n.26 ("[A]ccept[ing] … [D]efendants' time-bar argument would penalize, not encourage, the use of those important tools."). But a rule that automatically forbade tolling once a party had inquiry notice would do just that. Indeed, if a shareholder has enough suspicion of wrongdoing to file a successful § 220 action, then there is some probability that the shareholder also has inquiry notice. *See, Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 567 (Del. 1997) (holding that, to institute a proper § 220 action to investigate fraud, the plaintiff must demonstrate "a credible basis to find probable

wrongdoing"). The District Court's categorical exception would seem to swallow the general principle that tolling may apply after the filing of a § 220 action, and that ruling thus cannot stand.[17]

The filing of a § 220 action does not, however, automatically toll the applicable limitations period. Delaware courts have refused to draw such a bright line and have instead said that "there is no hard and fast rule tolling the running of the statute of limitations during the pendency of books and records litigation[,]" but that "[t]he pendency of such an action, and the relationship between it and the claims eventually filed, may in some circumstances operate to toll the limitations period[.]" *Sutherland v. Sutherland*, 2009 WL 1177047, at *1 (Del. Ch. Apr. 22, 2009). Considerations such as the existence of "deceitful, bad faith conduct," *Technicorp*, 2000 WL 713750, at *7, or evidence that, "without the information gathered during the [§] 220 action," suit could not have been brought, *Orloff*, 2005 WL 3272355, at *10, are

---

[17] Elkin suggests that tolling should apply to only equitable rather than legal claims. But *Technicorp* offers no support for that conclusion. In that case, the plaintiff sought $28.5 million dollars in damages in addition to a variety of equitable remedies. *Technicorp Intern. II, Inc. v. Johnston*, CIV. A. No. 15084, 2000 WL 713750, at *1-2 (Del. Ch. May 31, 2000). The Chancery Court noted that even if some of the claims were subject to the statute of limitations, the limitations period would be tolled due to the § 220 action. *Id.* at *9. Thus, tolling could apply to both the legal and equitable claims, were this case still being litigated in a Delaware court.

factors favoring tolling. But such factors do not appear to be prerequisites to tolling. The parties have not directed us to any case (apart from the District Court's opinion here) refusing to toll the limitations period after a successful § 220 action. It seems, instead, that Delaware law preserves a court's discretion to toll or not toll the limitations period on claims that may be informed by the results of a § 220 action. The decision to toll is not dependent upon inquiry notice. [18]

---

[18] Judge Shwartz has a different perspective on this point. To her, this test could allow a plaintiff who already has sufficient facts to bring suit to use the filing of a § 220 action to avoid promptly proceeding – in effect, to use it as a shield from the statute of limitations. Judge Shwartz is of the view that, under Delaware law, a § 220 action tolls the statute of limitations when the plaintiff could not have filed his complaint without the information obtained through that action, *see Orloff*, 2005 WL 3272355, at \*10, or at least could not have developed his claims without access to the corporation's books and records, *see Sutherland*, 2013 WL 2362263, at \*6 n.70, and, by extension, that tolling would be improper where a plaintiff has sufficient evidence to proceed, such as where the information acquired through the § 220 action was not necessary for the plaintiff to file his complaint. To hold otherwise, she believes, could enable a plaintiff to use a § 220 action to delay filing a lawsuit to gain a tactical advantage. She notes that because a § 220 action provides a means for early and expedited discovery, a plaintiff may seek to use the action for purposes beyond simply determining whether he has a cause of action. *See Rales v. Blasband*, 634 A.2d 927, 934 n.10 (Del. 1993) (describing § 220 "as an information-gathering tool" available to shareholders investigating the "possibility" of wrongdoing).

Courts in our Circuit should proceed with due regard for the positive role that § 220 actions are meant to play under Delaware law. That is especially true when, as in this case, a Delaware court has exercised its judgment and concluded that a § 220 action has merit.[19] *See Wolst v. Monster Beverage Corp.*, CIV. A. No. 9154, 2014 WL 4966139, at *1 (Del. Ch. Oct. 3, 2014) (noting that "[a] stockholder invoking her rights under Section 220 must demonstrate a 'proper purpose' for the inspection" (quoting 8 Del. C. § 220(b))). In such circumstances, tolling is likely appropriate absent a countermanding consideration, such as evidence that a shareholder pursued the § 220 action in bad faith or in order to stall.

Norman did successfully seek relief under § 220 and there is no indication that he proceeded in bad faith. In fact, he can point to valuable information that he acquired through his § 220 action. For instance, relevant to his fraud claim, he gained access to the Shareholder Loan Schedule which contained loan repayment figures that differed from those in

---

[19] In this case, the Court of Chancery found "incredible sloppiness" and a "complete inattention to the corporate forms and formalities." (App. at 342.) And it saw "a credible basis here for inferring possible mismanagement and wrongdoing on the part of Mr. Elkin." (App. at 341.) The Court expressed doubt that "serious damage" had been done to Norman, but nevertheless concluded that there was a sufficient basis to allow Norman access to USM records to look for signs of wrongdoing. (App. at 342.) Weight must be given to that judgment when considering the propriety of tolling.

28

the December 2002 Letter he received from USM. We will therefore remand to allow the District Court to determine, consistent with our reasoning above, whether the statute of limitations was tolled from the initiation of Norman's § 220 action in November 2004 until the successful completion of it in October 2005. *Cf. Technicorp*, 2000 WL 713750, at *9 (indicating that it is the institution of the § 220 action (or other litigation) "to ascertain the facts involved in the later suit" that tolls the limitations period).

Because the District Court rejected the argument for § 220-based tolling, it has never conclusively resolved whether Norman's claims would be timely if tolling were to apply. It is possible that the District Court may still conclude that several of the claims were already barred when Norman filed his § 220 action in November 2004. With regard to the conversion claim, the Court strongly suggested, but did not definitively determine, that public records would have put Norman on notice of the transfer of licenses to TEG in 1998. *Norman II*, 726 F. Supp. 2d at 473.[20] With regard to the breach of contract theories, the District Court indicated that an unspecified combination of the 2000 and 2001 K-1 forms, the summer 2002 phone call, the December 2002 Letter, and the October 2003 Letter had put Norman on inquiry notice.

---

[20] The District Court noted "that [Norman] was not incapable of learning the facts giving rise to his conversion and usurpation claims" in 1998. *Norman II*, 726 F. Supp. 2d at 473. However, it did not definitively determine that Norman's notice of the sale was sufficient because it concluded that the events of 2002, such as the December 2002 letter, were clearly adequate. *Id.*

29

*Norman IV*, 2015 WL 4886049, at *3. [21]  And with regard to the breach of fiduciary duty claims, the Court decided that

[21] Norman argues that the District Court should have been bound by its earlier decision in *Norman II* that the breach of contract claim based on Elkin's failure to make a pro rata distribution was timely.  But "we have consistently held" that reconsideration is appropriate when "new evidence is available … or … the earlier decision was clearly erroneous and would create manifest injustice[.]" *Roberts v. Ferman*, 826 F.3d 117, 126 (3d Cir. 2016) (quoting *Pub. Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 117 (3d Cir. 1997)).  In such circumstances, a District Court is entitled to reconsider its decision if it "explain[s] on the record the reasoning behind its decision to reconsider the prior ruling … [and] take[s] appropriate steps so that the parties are not prejudiced by reliance on the prior ruling." *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997).

The District Court explained that it was re-evaluating *Norman II* because the earlier decisions were based "on a more limited evidentiary record" and there was an "evidentiary hole in the first trial" that was filled by evidence provided in the second trial. *Norman v. Elkin* ("*Norman IV*"), CIV. A. No. 06-005-LPS, 2015 WL 4886049, at *3 n.5 (D. Del. Aug. 14, 2015) (citation omitted from second quotation). In particular, the October 2002 Letter was part of the record in the first trial, but the Court in *Norman II* erroneously concluded that "[t]he letter sent from [Norman's] counsel to Defendant Elkin is not in evidence, and therefore, the Court cannot consider it." 726 F. Supp. 2d at 471.  The District Court was therefore entitled to reconsider its decision in light of the new evidence of the content of the letter and in order to

30

Norman had inquiry notice "by December 2002" but did not decide whether Norman had notice at an earlier point. *Norman II*, 726 F. Supp. 2d at 474-75. The Court also dismissed, without additional clarification, the declaratory judgment and unjust enrichment claims, because they were "based on the same facts as previously addressed in [Norman's] other claims[.]" *Id.* at 476. Since determining precisely when Norman had inquiry notice is a highly fact-intensive question, *see Cantor*, 414 F.3d at 441 (explaining that determining "when a reasonable person in plaintiffs' position knew or should have known of the claim" is "a fact intensive inquiry"), the District Court should address it in the first instance, with the purpose of determining whether Norman should benefit from tolling as a result of the filing of the § 220 action and, if so, whether his claims are timely even if tolling based on the § 220 action is appropriate.[22]

---

correct an erroneous ruling. The Court explained its reasoning at length on the record and also made efforts to minimize undue prejudice by allowing both parties to extensively brief and argue the statute of limitations issue. *Norman IV*, 2015 WL 4886049, at *2-3. Accordingly, there was no error in that regard.

[22] As is discussed herein, we conclude that Norman's fraud claim can be rejected on alternative grounds. Therefore, we do not opine on the timeliness of that claim. Norman's appellate briefs only lightly touch upon his claims other than breach of contract, conversion, and fraud. Our basis for vacatur (the failure to apply the correct test for tolling in light of § 220) applies fully to Norman's other claims, and Norman argued that "the [D]istrict [C]ourt erred when it held that Norman's pursuit of his statutory books and

## B. *Breach of Contract via the Shareholder Loan Agreement*

The District Court overturned the jury's verdict that Elkin had committed a breach of contract when he caused USM to enter into the Shareholder Loan Agreement with him. As the Court saw it, the claim failed because Norman could not point to any independent damages flowing from the signing of the Shareholder Loan Agreement.[23] Norman, of course, argues that the Court's analysis and conclusion are wrong. In response, Elkin says that Norman waived any such argument when he conceded before the District Court that

---

records demands and lawsuit under [8 Del. C. § 220] did not toll his statute of limitations for *all claims*[.]" (Opening Br. at 2 (emphasis added).) Therefore, we also vacate the judgment against Norman's claims for usurpation of corporate opportunity, breach of fiduciary duty, aiding and abetting, and unjust enrichment. The District Court should consider whether the other claims were in fact timely and should be put before a jury.

[23] *See Norman IV*, 2015 WL 4886049, at *2 ("At trial, Norman failed to present evidence from which a reasonable factfinder, even drawing all reasonable inferences in favor of Norman, could have found that Norman proved he was damaged as a result of Elkin's signing the [Shareholder Loan Agreement]. At the hearing, Norman's counsel conceded that he did not present evidence that Norman was damaged by the execution of the [Shareholder Loan Agreement], independent of the alleged derivative damages resulting from execution of the Agreement.").

there were "no independent damages" flowing from the signing of the Shareholder Loan Agreement. (App. at 951.)

The two breach of contract claims Norman continues to press are before us in a peculiar posture. Both stem from the same oral agreement, and both allegedly led to the same injury, namely the failure to receive distributions according to the equity structure of USM. In this case in which the parties agree on practically nothing, everyone agrees that Norman sought the same set of damages through the claim of breach by failure to make pro rata distributions and the claim of breach by entering the Shareholder Loan Agreement.

The confounding factor is that, procedurally, the pro rata distribution breach is arguably untimely and has been objected to, while the Shareholder Loan Agreement breach might also be untimely but was not objected to as such. Therefore, the statute of limitations might stand as a bar to the former claim but not the latter. Norman has endeavored to use his Shareholder Loan Agreement claim as a way to reach the pool of damages that existed only derivatively from the failure to make pro rata distributions, while he sidesteps the issue of timeliness. This may be what led the District Court to conclude that Norman was required to prove damages other than those barred by the statute of limitations in order to prevail on his breach of contract claim concerning the Shareholder Loan Agreement.

Assuming it turns out to be the case that the pro rata distribution claim is time-barred, we agree with the District Court that Norman should not be able to rely on an earlier breach of the oral agreement in order to bypass the statute of limitations and reach the same set of damages that would

33

otherwise be off limits. If Norman knew about the improper distributions and failed to bring a timely suit, he cannot revive his claim by asserting that the Shareholder Loan Agreement ultimately resulted in the same damages, even if Elkin did not raise a statute of limitations defense with respect to that earlier breach. *Cf. Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997) (concluding in the antitrust and RICO contexts that a "plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period"); *Annulli v. Panikkar*, 200 F.3d 189, 197 (3d Cir. 1999), (applying *Klehr* and concluding that plaintiffs "cannot rely on new injuries arising out of predicate acts of racketeering … to recover for any injuries caused by these 'earlier predicate acts that took place outside the limitations period'" (quoting *Klehr*, 521 U.S. at 190)), *overruled on other grounds by Rotella v. Wood*, 528 U.S. 549 (2000).

That does not mean, however, that Elkin's breach via the Shareholder Loan Agreement was not a breach. It was, and the District Court erred in rejecting the breach of contract claim regarding the Shareholder Loan Agreement on the grounds that Norman could not prove anything but nominal damages. Delaware courts have followed the approach of the Restatement (Second) of Contracts § 346, which states that "[t]here are … instances in which loss is caused but recovery for that loss is precluded because it cannot be proved with reasonable certainty … . In all these instances the injured party will nevertheless get judgment for nominal damages[.]" *See Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC*, CIV. A. Nos. 3158, 3406, 2009 WL 1111179, at *12 n.48 (Del. Ch. Apr. 27, 2009) (quoting the Restatement (Second) of Contracts § 346); Richard A. Lord, Williston on Contracts

34

§ 64:6 (4th ed. 2017) ("An unexcused failure to perform a contract is a legal wrong.  An action will therefore lie for the breach although it causes no injury").  Even if the damage from Elkin's execution of the Shareholder Loan Agreement was limited to the disavowal of his obligation to contribute $750,000 in capital and the wrongful recharacterization of some of his contributions as "loans," Norman would still at least be entitled to nominal damages.  We therefore conclude that the District Court erred in vacating the jury's verdict with regard to the Shareholder Loan Agreement.  At a minimum, on remand, Norman is entitled to reinstatement of the jury's verdict with respect to that breach of contract and to nominal damages.[24]

---

[24] Since the District Court concluded that there were no damages, it did not consider Elkin's alternative argument that there was insufficient evidence of an agreement preventing him from causing the company to execute the Shareholder Loan Agreement.  But in *Norman II*, the District Court had already decided that "sufficient evidence was presented on which the jury could have concluded that an agreement between [Norman] and Defendant Elkin existed for Defendant Elkin to contribute $750,000 in capital, and that Defendant Elkin breached that agreement when he executed the Shareholder Loan Agreement to convert any funds in excess of $420,000 from capital to loans."  726 F. Supp. 2d at 477.  We see no reason to overturn that well-reasoned ruling.

## IV. CROSS APPEAL

Elkin filed a cross-appeal and argues that, even if Norman's fraud and conversion claims were timely, we can affirm the District Court's entry of judgment on those claims because Norman did not support them with sufficient evidence. Affirmance on that basis is appropriate "only if, viewing the evidence in the light most favorable to [Norman] and giving [him] the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability [against Elkin]." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993). Such a "judgment as a matter of law should be granted sparingly, [but] a scintilla of evidence is not enough to sustain a verdict of liability." *Id.* We conclude that Elkin's argument about conversion was inadequately briefed and, accordingly, has been effectively waived. Elkin's fraud argument, however, was fully developed and we agree that under Delaware law, Norman failed to prove that Elkin's fraudulent conduct damaged him.

### A. Conversion

For an argument to be preserved on appeal it must be presented "together with supporting arguments and citations." *Simmons v. City of Phila.*, 947 F.2d 1042, 1065 (3d Cir. 1991) (citation omitted). "It is well settled that if an appellant fails to comply with these requirements on a particular issue, the appellant normally has abandoned and waived that issue on appeal and it need not be addressed by the court of appeals." *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993).

36

Elkin's argument with regard to conversion is cursory at best. After stating the legal tests for conversion and misappropriation, Elkin asserts that "Norman offered no evidence of any property interest that was convertible" and no evidence "of any appropriate measure of damages that the jury could employ to develop a reasonable award[.]" (Ans. Br. at 77 (internal quotation marks omitted).) The support offered for that assertion is a reference to a memorandum filed in the District Court in connection with Elkin's motion for judgment as a matter of law. But an attempt to incorporate by reference arguments made in the District Court does not satisfy the rules of appellate procedure. *See* Fed. R. App. P. 28(a)(8) and (b) (stating that a party's brief must contain "the argument" including "contentions and the reasons for them, with citations to the authorities and parts of the record on which the [party] relies"); *cf. Nagle v. Alspach*, 8 F.3d 141, 143 (3d Cir. 1993) ("When an issue is either not set forth in the statement of issues presented or not pursued in the argument section of the brief, the appellant has abandoned and waived that issue on appeal."). Elkin has thus waived his argument with respect to the conversion claim.

### B. Fraud

Elkin also argues that there was insufficient evidence to justify the jury's verdict on the fraud claim. Under Delaware law, the elements of fraud are:

> (1) a false representation of (or concealment of) a fact; (2) defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff or to cause plaintiff to

37

> refrain from acting; (4) [plaintiff's] action or
> inaction taken in justifiable reliance upon the
> representation; and (5) damage to plaintiff as a
> result of such reliance.

*Yarger v. ING Bank, fsb*, 285 F.R.D. 308, 327 (D. Del. 2012). Importantly, in cases involving both a breach of contract and an allegation of fraud, damages from the fraud must be pled "separate and apart from … breach damages." *Cornell Glasgow, LLC v. La Grange Properties, LLC*, CIV. A. No. N11C-05-016, 2012 WL 2106945, at *9 (Del. Super. Ct. June 6, 2012); *see also Lazard Debt Recovery GP, LLC v. Weinstock*, 864 A.2d 955, 972 (Del. Ch. 2004) (dismissing a fraud claim for failure "to plead loss causation sufficiently"). While there may have been sufficient evidence to support all of the other elements of fraud, there is no evidence in the record that Norman suffered damages as a result of the fraud that are separate and apart from the damages alleged for breaches of contract.

The basis for Norman's fraud claim was the December 2002 Letter that understated the amount that Elkin paid himself from USM's coffers. However, the improper distributions had already occurred by the time the December 2002 Letter was sent.[25] Norman has not presented any evidence to the contrary.[26] Nor has he pointed to any other

---

[25] The only transaction listed on the Shareholder Loan Schedule after the December 2002 Letter is a loan of $12,000 from Elkin on December 21, 2002.

[26] Norman attempts to incorporate by reference his post-trial briefing in the District Court. Again, that is

way that the damages he suffered would have been lessened had he found out about the full extent of the payments made to Elkin at the time of the December 2002 Letter rather than as a result of the October 2003 Letter.

In other words, the damages that Norman suffered from Elkin's failure to make pro rata distributions were not caused by the allegedly fraudulent December 2002 Letter. Instead, the damages Norman claims he suffered as a result of the fraud are merely a "rehash" of damages claimed for the alleged breaches of the oral contract. *See Cornell Glasgow,* 2012 WL 2106945, at \*9 ("Delaware courts have consistently held that to successfully plead a fraud claim, the allegedly defrauded plaintiff must have sustained damages as a result of a defendant's actions. And the damages allegations may not simply 'rehash' the damages allegedly caused by the breach of contract." (internal quotation marks omitted)). Because Norman did not show "with particularity what [Elkin] obtained through [his] alleged fraud," *Albert v. Alex. Brown Mgmt. Servs., Inc.*, CIV. A. Nos. 762-N, 763-N, 2005 WL 2130607, at \*7 (Del. Ch. Aug. 26, 2005), there was no basis for the jury to find that Elkin's fraud had damaged Norman. *See ITW Glob. Invs. Inc. v. Am. Indus. Partners Capital Fund IV, L.P.,* CIV. A. No. N14C-10-236, 2015 WL 3970908, at \*5 (Del. Super. Ct. June 24, 2015) ("Because [the plaintiff] has pleaded materially identical damages … they fail to separate the damages incurred by any alleged fraudulent misrepresentation and any alleged breach of contract … . Accordingly, [the] Count … for fraud must be dismissed

---

impermissible. *Nagle v. Alspach*, 8 F.3d 141, 143 (3d Cir. 1993). And in any event, the brief that he cites does not point to any specific evidence in the record.

because it pleads damages that are simply a 'rehash' of the breach of contract damages."). We will therefore affirm the District Court's decision to vacate the fraud judgment and to grant judgment as a matter of law in Elkin's favor on that claim.

## V.    CONCLUSION

For the foregoing reasons, we will affirm on alternative grounds the decision to enter judgment in Elkin's favor on the claim of fraud. We will vacate the entry of judgment in Elkin's favor on Norman's other claims and will remand to the District Court to reinstate the award of nominal damages for the breach of contract claim concerning the Shareholder Loan Agreement and to determine whether § 220 tolling should apply, and, if so, whether any of the remaining claims are timely.