PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

Nos. 19-2294 and 19-2410

———————

JEFFREY M. NORMAN,

Appellant in 19-2410

v.

DAVID W. ELKIN; RICHARD M. SHORIN;
ELKIN GROUP INC.; U.S. MOBILCOM, INC.

David W. Elkin
Appellant in 19-2294

———————

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-06-cv-0005)
District Judge: Hon. Leonard P. Stark

———————

Submitted Under Third Circuit LAR 34.1(a)
March 23, 2020

Before: JORDAN, RESTREPO, and GREENBERG, *Circuit Judges*

(Opinion Filed:  May 29, 2020)

————————

David A. Felice
Bailey & Glasser
2961 Centerville Road – Ste. 302
Wilmington, DE   19808
        *Counsel for Jeffrey M. Norman*

David W. Elkin
805 Bryn Mawr Avenue
Newtown Square, PA  19073
        *Pro Se*

————————

OPINION OF THE COURT

————————

JORDAN, *Circuit Judge*.

This appeal, the second we have been asked to decide in this case, marks what is, one hopes, effectively the final chapter of a bitter dispute spanning more than 14 years and involving state and federal courts, two different district court judges, two jury trials, and seemingly innumerable procedural and dispositive motions, both pre- and post-trial.  Pursuant to our mandate in the parties' prior appeal, *Norman v. Elkin*, 860 F.3d 111 (3d Cir. 2017) ("*Norman V*"), the District Court decided that the statute of limitations for all of plaintiff Jeffrey M. Norman's claims, which include both contract and non-contract causes of action, were tolled during the pendency of a books and records request he initiated in the Delaware Court of Chancery in November 2004 pursuant to § 220 of Title 8 of

2

the Delaware Code (the "§220 Action"). Notwithstanding Norman's entitlement to §220-based tolling, however, the Court also concluded that all but a subset of his breach of contract claim was time-barred because he knew or should have known the facts giving rise to those claims for longer than the applicable limitations period before filing the §220 Action. Both Norman and defendants David W. Elkin, The Elkin Group, Inc. ("TEG"), U.S. Mobilcomm, Inc. ("USM"), and Richard Shorin (collectively, the "Elkin Defendants") now challenge multiple aspects of the District Court's ruling.

With one exception, we hold that the parties' assertions of error by the District Court lack merit. The single exception deals with Norman's breach of contract claim based on events that occurred in May, July, and August of 2001. We agree with Norman that the District Court incorrectly determined that those claims were untimely. Accordingly, we will reverse that aspect of the District Court's final judgment, affirm all others, and remand to the District Court for the limited purpose of entering a revised final judgment consistent with this decision.

## I.    BACKGROUND[1]

### A.    Factual Background

Norman and Elkin founded USM in the early 1990s for the purpose of aggregating "Phase 1" 200 MHZ licenses issued

---

[1] We focus our statement of the factual and procedural background on those matters most pertinent to the parties' present appeals. Additional information can be found in *Norman V*, and the District Court's numerous opinions throughout this case's extensive history. *See Norman v. Elkin,*

by the Federal Communications Commission ("FCC").[2] They orally agreed that Elkin would hold 75% of USM's equity and Norman the other 25%. Consistent with that ownership structure, they also agreed that, of the $1 million required to capitalize USM, Elkin would contribute $750,000 and Norman would contribute $250,000. Norman's role in USM was to acquire the initial licenses. After he successfully did so, "Norman's day-to-day involvement in USM ended[,]" and "Elkin continued to manage USM's affairs." *Norman VI*, 338 F. Supp. 3d at 369.

In 1998, the FCC announced it would auction "Phase II" licenses. Elkin registered USM as a bidder in one such auction in which "USM won the rights to several Phase II licenses[.]" *Id*. Elkin subsequently transferred USM's rights in the Phase II licenses to another company that he owned, TEG. TEG's involvement purportedly was necessary because USM did not have sufficient funds on its own to participate in

---

No. CIV.A. 06-005-JJF, 2007 WL 2822798 (D. Del. Sept. 26, 2007) ("*Norman I*"); *Norman v. Elkin*, 726 F. Supp. 2d 464 (D. Del. 2010) ("*Norman II*"); *Norman v. Elkin*, 849 F. Supp. 2d 418 (D. Del. 2012); *Norman v. Elkin*, No. CV 06-005-LPS, 2015 WL 4886049 (D. Del. Aug. 14, 2015); and *Norman v. Elkin*, 338 F. Supp. 3d 361 (D. Del. 2018) ("*Norman VI*").

[2] "Phase I" licenses, which were distributed by lottery, were the "first wave" of licenses that covered particular radio frequencies in specified geographic areas. *Norman V*, 860 F.3d at 116. The FCC subsequently issued "Phase II" licenses "through a competitive auction." *Id.* Some Phase II licenses overlapped, but were not coterminous, with previously issued Phase I licenses.

4

the auction and it was important to ensure that "a friendly corporation acquired the licenses that overlapped with those already owned by USM." *Norman V*, 860 F.3d at 116. Norman closely monitored the auction and emailed Elkin requesting information on its outcome. Elkin did not respond. *Id.* Some FCC notices relating to the auction listed USM as the winning bidder of Phase II licenses, while others referred to TEG as the owner of those same licenses. *Id.*

At some unknown time between 1995 and 2002, Elkin caused USM to enter into a Shareholder Loan Agreement ("SLA") with him. Under the SLA, "USM agreed to treat any amount Elkin contributed above his capital requirement as a loan." *Norman VI*, 338 F. Supp. 3d at 369. Elkin neither informed Norman about the SLA nor sought his approval for it, and purportedly lent USM in excess of $600,000 pursuant thereto.

In 2000 and 2001, USM started selling off its licenses. "Norman received federal income tax K-1 forms from USM for the tax years 2000 and 2001 that declared USM had realized a capital gain." *Id.* at 370. "Those K-1 forms did not state what had been sold, and they did not list any shareholder loans or distributions. However, in a deposition, Norman admitted that a capital gain, by definition ... has to be sale of a license[.]" *Norman V*, 860 F.3d at 117 (quotations omitted and alterations in original). In a series of distributions effectuated by Elkin from 2000 to 2002, USM paid Elkin $615,026 from the proceeds of the license sales. Norman received nothing.

5

After not hearing from Elkin "in ages," (JA at 860,)[3] Norman called him in the summer of 2002 (the "Summer 2002 Call"). Norman testified that Elkin was "a little bit evasive" on the call, but admitted that licenses had been sold and that he (Elkin) had taken a distribution. *Norman V*, 860 F.3d at 117. When Norman inquired why he (Norman) had not received any distributions, Elkin responded, "it wasn't your turn." *Id.* Norman requested additional information, which Elkin never provided.

Perhaps spurred by Elkin's lack of cooperation, Norman had his attorney send Elkin a letter in October 2002 (the "October 2002 Letter") requesting information regarding "the sale or other disposition of any assets or stock of [USM] over the past three (3) years, and the distribution or use of any proceeds of any such sales or dispositions." *Id.* (alteration in original). Elkin responded by letter approximately two months later on December 3, 2002 (the "December 2002 Letter"), acknowledging that USM had sold the licenses "it owned," but the letter included agreements revealing TEG had sold certain Phase II licenses. *Id.* "The letter also included a breakdown of the uses of the proceeds, including repayment of what were characterized as shareholder loans[.]" *Id.* In October 2003, USM responded to requests for further information by Norman's attorney by sending him a letter (the "October 2003 Letter") that included a copy of the SLA. *Id.*

---

[3] As used herein, references to "JA" are to the parties Joint Appendix filed in *Norman V* (case numbers 16-1924 and 16-2164), which, by Order dated February 28, 2020, we permitted the parties to utilize in the present appeals.

**B.  Procedural Background**

Based on the information he had obtained over the prior two years, Norman filed the §220 Action on November 16, 2004, which was resolved in Norman's favor on October 2, 2005.  Approximately two months later, Norman filed this lawsuit in the Delaware Court of Chancery, which the Elkin Defendants removed to the District Court.  In his complaint, "Norman raised a wide variety of tort and contract claims against [Defendants] including breach of contract, usurpation of corporate opportunities, conversion, fraud, breach of fiduciary duties, and unjust enrichment." *Norman V*, 860 F.3d at 118.

In May 2009, three of Norman's claims –  breach of contract, fraud, and conversion – were tried to a jury.  The jury returned a verdict for him on all counts.  Elkin moved for judgment as a matter of law on the ground that Norman's claims were time-barred.  The District Court largely agreed, and held Norman's claims were untimely except those based on two breach-of-contract theories: that Elkin breached his oral agreement with Norman regarding USM's capitalization by executing the SLA and by failing to make *pro rata* distributions of the license sale proceeds.

After further motions by both Norman and Elkin, the District Court held a second jury trial on Norman's two remaining claims. "The jury again found in Norman's favor and awarded him $1 in nominal damages based on Elkin's execution of the SLA and $73,180.17 in compensatory damages for Elkin's failure to make *pro rata* distributions." *Norman VI*, 338 F. Supp. 3d at 368.  The amount of damages awarded indicates that the jury considered a substantial portion

7

of the funds Elkin directed to himself between 2000 and 2002 to be repayments of loans he made to USM, rather than distributions. Elkin again moved for judgment as a matter of law, and again the District Court agreed. Most significantly, the District Court held that the §220 Action did not toll the statute of limitations for any of Norman's claims, rendering all of his claims untimely. The Court vacated the jury's verdict and entered final judgement in Elkin's favor.

Both Norman and Elkin appealed. Ultimately, we vacated the entry of judgment in Elkin's favor, excepting the fraud claim. We remanded the case to the District Court for two purposes: "(1) for the Court to reinstate the jury verdict and award of nominal damages for Norman's SLA-based breach of contract claim and (2) for the Court to determine whether §220 tolling should apply to Norman's claims, and, if so, whether Norman's remaining claims are timely."[4] *Id.*

---

[4] Surprisingly, Elkin asks us to overrule part of our earlier mandate based on the District Court's conclusion on remand that Norman's SLA-based breach of fiduciary claim, premised on the same facts as his SLA-based breach of contract claim, was time-barred. In making such a request, Elkin ignores that he had a full and fair opportunity during the first appeal to challenge the SLA-based breach of contract claim as untimely, just as he did with the SLA-based breach of fiduciary duty claim, but failed to do so. As we specifically noted in *Norman V*, that failure created a "confounding" situation in which "the statute of limitations might stand as a bar to the [breach of fiduciary duty claim] but not the [breach of contract claim]." *Norman V*, 860 F.3d at 128. The fact that the entirely foreseeable disparity we identified in *Norman V* came to fruition, a disparity that Elkin bears sole responsibility for,

8

On remand, the District Court, applying our guidance from *Norman V*, concluded that the statute of limitations for each of Norman's claims was tolled during the pendency of the §220 Action. The Court then proceeded to examine whether Norman's claims nevertheless were untimely by assessing whether he had actual or inquiry notice of his claims within the applicable limitations period – three years for his contract claim and two years for his non-contract claims – before initiating the §220 Action. Because two of the distributions that Elkin made to himself occurred in 2002, the Court held Norman's breach of contract claim based on those distributions was timely, as it was made within three years of Norman bringing the §220 Action. For each of Norman's other claims, including breach of contract based on distributions that Elkin made to himself in May, July, and August of 2001, the Court held that Norman had at least inquiry notice of those claims beyond the applicable limitations period, and thus dismissed them as untimely. Accordingly, the District Court entered judgment in Norman's favor on his breach of contract claim premised on distributions made in 2002 and, per our mandate, his breach of contract claim based on the execution of the SLA, but in Elkin's favor on all other claims.

Both Norman and Elkin moved for reargument. At the hearing on the motion, Elkin argued for the first time that Norman was not entitled to tolling relating to the §220 Action because he brought that action in bad faith. Elkin attempted to introduce purported "evidence" of that bad faith, but the District Court refused to consider that new evidence and denied

---

does not entitle him to any relief. We reject Elkin's request to revisit that, or any other, aspect of *Norman V*.

9

all motions for reargument. Both Norman and Elkin timely appealed the final judgment.

## II.   DISCUSSION[5]

### A.   Elkin's Appeal

#### 1.   Tolling based on the §220 Action

Elkin's primary contention on appeal is that the District Court erred in concluding that the §220 Action tolled the

---

[5] This case was removed from the Delaware Court of Chancery to the District Court under 28 U.S.C. § 1441, on the basis of diversity jurisdiction, 28 U.S.C. § 1332(a). We have jurisdiction pursuant to 28 U.S.C. § 1291. "We exercise plenary review of an order granting or denying a motion for judgment as a matter of law and apply the same standard as the district court." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153,1166 (3d Cir. 1993) (citation omitted); *cf. Lake v. Arnold*, 232 F.3d 360, 365 (3d Cir. 2000) ("[P]lenary review extends to the District Court's choice and interpretation of applicable tolling principles and its conclusion that the facts prevented a tolling of the statute of limitations."). "[A]lthough the court draws all reasonable and logical inferences in the nonmovant's favor, we must affirm an order granting judgment as a matter of law if, upon review of the record, it is apparent that the verdict is not supported by legally sufficient evidence." *Lightning Lube, Inc.*, 4 F.3d at 1166. As to Elkin's sufficiency of the evidence arguments, we likewise "view[ ] the evidence in the light most favorable to [Norman]" and will affirm the District Court only if there "is insufficient evidence from which a jury reasonably could find liability [against

statute of limitations for Norman's claims.  In support of that position, he advances several arguments, each of which fails.  First, he makes an "order of operations" argument – that the District Court improperly decided the issue of §220-based tolling before determining if, and when, Norman had inquiry notice of each of his claims.  But the order in which the District Court chose to address those discrete issues is irrelevant.[6]  It is neither incorrect nor inherently inconsistent for a court to first determine that the statute of limitations for a claim should be tolled based on a successful §220 action but that the claim nevertheless is untimely because the plaintiff had actual or inquiry notice of his injury sufficiently in advance of that §220 action.  To the extent the District Court utilized that approach on remand, it did not err in doing so, even if it took what might be a more circuitous route to resolution.

Second, Elkin says that Norman is not entitled to §220-based tolling because of Norman's "complete lack of inquiry"

Elkin]." *Id.*  Finally, "[w]e review admissibility determinations, and exclusion of evidence for an abuse of discretion." *Quinn v. Consol. Freightways Corp. of Del.*, 283 F.3d 572, 576 (3d Cir. 2002).

[6] In that regard, Elkin appears to have misunderstood our instruction in *Norman V* for the District Court to determine "in the first instance" when Norman had inquiry notice of his claims.  *Norman V*, 860 F.3d 127.  The purpose of that instruction was not to dictate the structure of the District Court's opinion on remand, but rather, as the Court properly recognized, was to ensure that the District Court would be the first tribunal to decide that fact-intensive issue.

11

into his potential claims before initiating the §220 Action. (Elkin Opening Br. at 27.) Not only is this argument flatly inconsistent with the record, including evidence of Norman's efforts to obtain information from Elkin following the Summer 2002 Call, but it is legally meritless. Elkin fails to cite a single case, and we are aware of none, involving a successful §220 action in which a Delaware court has declined to grant tolling because of a "lack of inquiry." Nor are we aware of a case in which a Delaware court has even so much as suggested that such a concern is a relevant consideration in the §220-based tolling analysis.[7] That is hardly surprising, given that "pursuit of an action under § 220 is regarded as strong evidence that [a] plaintiff was aggressively asserting its claims at that time[.]" *Norman V*, 860 F.3d at 124 (quotations omitted and first alteration in original). The proper focus of a §220-based tolling analysis is the nature of the underlying §220 action and the results of it. While a plaintiff's conduct before filing a §220 action may be significant for other purposes, such as determining inquiry notice or laches, there is no support for

_____

[7] To the contrary, all of the cases to which Elkin directs us discuss a plaintiff's level of inquiry in distinct contexts, such as determining whether they had inquiry notice of their claims or if their claims were barred by laches. *See, e.g.*, *Technicorp Int'l II, Inc. v. Johnston,* No. CIV.A. 15084, 2000 WL 713750, at *7 (Del. Ch. May 31, 2000) (holding plaintiff was not on inquiry notice of claims because it was unable to discover wrongdoing despite diligent investigation); *Fike v. Ruger*, 754 A.2d 254, 262 (Del. Ch. 1999), *aff'd,* 752 A.2d 112 (Del. 2000) (claims barred by laches because plaintiff's "lack of knowledge was due to his failure to exercise his right to obtain information," including his right to inspect the company's books and records).

Elkin's assertion that it has any direct bearing on a §220-based tolling analysis itself.

Elkin's third contention is that the District Court erred by failing to determine on a claim-by-claim basis whether §220-based tolling should apply. Although the District Court did not specifically discuss each of Norman's claims individually, for all intents and purposes its analysis achieved the same purpose. The Court correctly recognized that there was a clear nexus between the §220 Action and each of Norman's claims in this case, which Elkin does not, and cannot, credibly refute. The Court similarly was right to note that Norman succeeded in the §220 Action. According to the Stipulated Order and Final Judgment that resolved the §220 Action, Norman secured, *inter alia*, access to 14 distinct categories of documents, each of which directly relates to at least one of his claims in this case. Moreover, we have already recognized that what Norman obtained in the §220 Action was "valuable information" with respect to this litigation. *Norman V*, 860 F.3d at 126. Thus, given Norman's broad success in the §220 Action and the obvious relationship between the §220 Action and all of the claims asserted here, there was no need for the District Court to specifically address the factors favoring tolling on a claim-by-claim basis. The same is true regarding any discussion of the factors weighing against tolling, such as whether the §220 Action was prosecuted in bad faith or for some other improper purpose, such as stalling to lengthen the limitations period. Those inquiries, which look at the underlying §220 action as a whole, did not warrant a claim-

13

by-claim analysis. We therefore discern no error in the District Court's approach.[8]

Fourth, Elkin contends that §220-based tolling was inappropriate for Norman's claims because, several years before Norman initiated the §220 Action, there had been widely available public information regarding the license transfers around which his claims revolve. To the extent that Elkin is arguing that inquiry notice forecloses §220-based tolling, we already rejected that argument in *Norman V*. As we explained, the relevant issue is not whether Norman was on inquiry notice at all, but whether, if he was on such notice, that notice preceded his commencement of the §220 Action by more than the applicable limitations period. To the extent that Elkin is arguing that Norman was not entitled to §220-based tolling because the §220 Action was not strictly necessary to bring his claims in light of the public information available to

---

[8] Elkin's reliance on *Orloff v. Shulman*, No. CIV.A. 852-N, 2005 WL 3272355, at *10 (Del. Ch. Nov. 23, 2005) is unavailing. In *Orloff*, the court declined to toll the limitations period for certain claims, despite the fact that the plaintiffs had partially succeeded in a related §220 action, because the plaintiffs had at least inquiry notice of those claims for approximately 20 years before initiating their §220 action. Far from holding that a successful §220 action does not support tolling the limitations period for all related claims, *Orloff* merely stands for the proposition that §220-based tolling cannot revive claims that already were untimely when the underlying §220 action was commenced. That is in accord with, and in no way contrary to, our holding in *Norman V* and the District Court's analysis on remand.

him, we largely rejected that argument too in *Norman V*. Not only did we recognize that the inability to file suit without the benefit of a §220 action is not a "prerequisite[]" to §220-based tolling, we also noted that the §220 Action, at a minimum, actually enhanced Norman's claims through the "valuable information" he secured. *Norman V*, 860 F.3d at 125–26. The District Court properly followed our guidance in *Norman V* by not treating Norman's ability to bring suit absent the §220 Action as a condition precedent to §220-based tolling and instead treating it as a factor to be balanced against other relevant considerations.[9] *See id.* ("Delaware law preserves a court's discretion to toll or not toll the limitations period on claims that may be informed by the results of a § 220 action…. Courts in our Circuit should proceed with due regard for the positive role that § 220 actions are meant to play under Delaware law. That is especially true when, as in this case, a Delaware court has exercised its judgment and concluded that a § 220 action has merit.").

We are also unpersuaded by Elkin's final argument on this issue, that both we, in *Norman V*, and the District Court, in *Norman VI*, based our respective §220-based tolling

---

[9] For the same reasons, we reject Elkin's argument that the District Court erred by not denying §220-based tolling given the absence of bad faith conduct or fraudulent concealment on his part. Again, while such considerations may be relevant to the analysis, they are not prerequisites to §220-based tolling. The District Court gave appropriate weight to the absence of bad faith by Elkin and acted well within its discretion in concluding that this absence did not outweigh the considerations strongly supporting §220-based tolling.

15

discussions on a misapprehension of the extent to which Norman succeeded in the §220 Action. More specifically, Elkin argues that (1) our statements that the Court of Chancery "granted" Norman broad relief are not accurate, (2) that our reliance on the Vice Chancellor's comments made at the end of the §220 Action were misplaced because they do not reflect his more recent view on the merits of that proceeding, and (3) that our decisions overstated the connection between the §220 Action and this litigation.

Elkin's first contention in this regard rests on hyper-technical and ultimately incorrect semantics. At the end of the §220 Action, the Vice Chancellor stated that he was "inclined to … grant[] the 220 relief in pretty broad form[,]" *Norman v. US MobilComm, Inc.*, No. CIV.A. 849-N, 2006 WL 1229115, at *2 (Del. Ch. Apr. 28, 2006) ("*US MobilComm*"), but he gave the parties the opportunity to reach their own agreement based on that guidance before formally ruling on the matter. The parties did reach such an agreement, in the form of a Stipulated Order and Final Judgment, which provided Norman with broad relief. More significantly, the Stipulated Order and Final Judgment, as the name suggests, was the Court of Chancery's judgment resolving the §220 Action and was formally approved and entered by the Vice Chancellor. Accordingly, and contrary to Elkin's assertion otherwise, it is evident that the Court of Chancery did, in fact, "grant" Norman broad relief in connection with the §220 Action. It is of no moment that what Norman received in the §220 Action was negotiated by the parties based on the Vice Chancellor's clear guidance that Norman should obtain broad relief and was not unilaterally imposed by the Vice Chancellor.

16

Likewise meritless is Elkin's assertion that the view the Vice Chancellor expressed about the merits of Norman's claims at the conclusion of the trial in the §220 Action was later undermined or superseded. In support of his position, Elkin relies on cherry-picked statements from an April 2006 decision by the Vice Chancellor addressing the entirely distinct question of whether Norman was entitled to an award of attorneys' fees for successfully prosecuting the §220 Action. The answer to that question turned on whether Norman had a "clear right" to the documents he sought in the §220 Action or whether USM had acted in bad faith in opposing Norman in that proceeding. *Id.* at *2-5. Neither of those issues has anything to do with the Vice Chancellor's post-trial view that the §220 Action was meritorious. Yet, insofar as the Vice Chancellor discussed that view in the April 2006 opinion, he unambiguously reiterated it. *See id.* at *1 ("At the end of a one-day trial, I stated that I was inclined to rule in Norman's favor and grant broad relief[.]"); *id.* at *2 ("At the end of trial I did not issue a ruling, but advised the parties that 'I'm very much inclined to be granting the 220 relief in pretty broad form.'"); *id.* ("[T]he parties do not dispute that Norman prevailed in the litigation[.]"); *id.* at *4 ("Although I ultimately concluded Norman had a proper purpose, I did not reach a firm decision on that issue until after I heard the evidence at trial.").

Finally, the connection between the §220 Action and this litigation has not been overstated. Elkin's assertion that there are "blatantly false allegations in the Amended 220 Complaint that bear no connection to the allegations in this litigation" is both conclusory and irrelevant. (Elkin Opening Br. at 45.) Even assuming that some allegations in the §220 Action do not bear a relationship to this litigation, it is beyond dispute that a great many of them are directly related.

17

Moreover, the categories of information Norman secured access to through the §220 Action have an obvious and strong nexus to Norman's claims here. Elkin has failed to argue or explain how any, let alone a meaningful percentage, of the relief that Norman obtained in the §220 Action is unrelated to at least one of Norman's various causes of action. In short, Elkin's various attempts to blunt the impact of the §220 Action on the tolling analysis fail in their entirety.

### 2. Purported evidence of Norman's bad faith in the §220 Action

Similarly unavailing is Elkin's assertion that, on remand from *Norman V*, the District Court wrongfully refused to allow him to present evidence that Norman pursued the §220 Action in bad faith. That argument rests of the incorrect premise that "[t]he issue of Norman's bad faith in pursuing the 220 Action was never an issue in this litigation until this Court made it part of the tolling calculus in *Norman V*." (Elkin Opening Br. at 47.) We did not create new law in *Norman V* merely by acknowledging that Delaware courts have recognized that "deceitful, bad faith conduct[]" is relevant to determining whether fact-gathering litigation, such as the §220 Action, can provide a basis for tolling. *Norman V*, 860 F.3d at 125 (quoting *Technicorp Int'l II, Inc. v. Johnston*, No. CIV.A. 15084, 2000 WL 713750, at *7 (Del. Ch. May 31, 2000)).[10] That long-

---

[10] Although *Technicorp* discussed "bad faith" conduct by the defendant corporation resisting a fact-gathering proceeding, rather than by the stockholder plaintiff, nothing in *Technicorp* suggests that bad faith conduct is significant only when it proceeds from the defendant.

18

standing principle was available to Elkin throughout this litigation, including when the District Court first addressed Norman's argument that the §220 Action tolled the statute of limitations for his claims. *See Norman II*, 726 F. Supp. 2d at 472 (citing *Technicorp*). Elkin could have and should have raised the issue long before we decided *Norman V*, if he thought it had any merit. The District Court did not abuse its discretion in refusing to allow Elkin to further prolong an already protracted litigation by belatedly raising a new issue and offering new evidence in support of it, despite having had ample prior opportunity to do so.[11] Elkin's arguments on appeal are all unpersuasive.

---

[11] Assuming *Norman V* did create new law, which it did not, the District Court still did not abuse its discretion in excluding Elkin's late-offered evidence. That is because Elkin only presented that evidence to the Court for the first time at a hearing on the parties' motions for reargument. At a minimum, if Elkin wished to pursue the argument that Norman undertook the §220 Action in bad faith, it was incumbent on him to raise that argument and provide supporting evidence from the outset of the remand proceedings. Having made the strategic choice only to raise the bad faith argument for the first time in connection with a motion for reargument, Elkin cannot complain that the District Court acted outside of its discretion in refusing to allow him to surprise the Court (and Norman) with new evidence produced at the last minute.

**B.      Norman's Appeal**

**1.      Contract-based claims**

Norman first argues that the District Court erred in concluding that the statute of limitations for his distribution-based breach of contract claim began to run at the time of each distribution and not in May 2002 when the distributions were completed, because the distributions were severable, rather than continuous violations.  We disagree.  Under Delaware law, "[t]he continuing breach doctrine is 'narrow' and 'typically is applied only in unusual situations.'"  *AM Gen. Holdings LLC v. The Renco Grp., Inc.*, No. 7639-VCS, 2016 WL 4440476, at *11 (Del. Ch. Aug. 22, 2016) (quoting *Desimone v. Barrows*, 924 A.2d 908, 924–25 (Del. Ch. 2007)).  Generally speaking, if a "plaintiff could have alleged a *prima facie* case for breach of contract ... after a single incident[,]" then the "continuing breach doctrine does not apply even when confronted with numerous repeated wrongs of similar, if not same, character over an extended period."  *Id.* at *12 (internal quotation marks and citations omitted).

Norman's breach of contract claim does not present an "unusual situation."  Each individual distribution Elkin made to himself constituted, at least in theory, a discrete and readily determinable violation of Norman's rights as a 25% equity-holder in USM.  Nevertheless, Norman contends that he has asserted an overarching and continuous breach because his damages from each individual distribution were "inherent[ly] contingen[t]" on the SLA being invalidated and could not be calculated until that time.  (Norman Answering Br. at 50-51.)  That argument, however, ignores that, as Norman himself asserts in his Amended Complaint, the SLA's validity and

20

Elkin's purported failure to make proper distributions could be, and were, adjudicated simultaneously. The lone authority Norman now cites in support of his position, *Branin v. Stein Roe Investment Counsel, LLC*, No. CV 8481-VCN, 2015 WL 4710321 (Del. Ch. July 31, 2015), is readily distinguishable. In *Branin,* an employee sought to enforce a contractual right to indemnification against his current employer for expenses he incurred in defending against a lawsuit by his former employer. Because the employee "could not have enforced his indemnification right until the nature of his conduct underlying the [former employer's lawsuit] was established[,]" "the statute of limitations on [the employee]'s indemnification claim did not begin to run until the underlying litigation was resolved[,]" because it would have been "inefficient" to require the employee to sue continually before that resolution. *Id.* at *4, 7. Here, there was no prior, independent litigation that needed to be resolved before Norman could bring a breach of contract claim. Nor are there comparable "efficiency" considerations. The question of the SLA's validity arose in connection with Elkin's defense to Norman's breach of contract claim, not as a condition precedent to the claim. We reject Norman's unsupported attempt to dramatically expand the "narrow" continuous breach doctrine such that it reaches defenses to claims rather than true contingencies.

We do, however, agree with Norman's second assertion regarding his breach of contract claim: events that occurred prior to the May, July, and August 2001 distributions did not provide him with inquiry notice of his claim pertaining to those distributions. Even assuming the public records regarding the license transfers and the 2000 Form K-1 that Norman received should have prompted him to inquire further into what was happening at USM, a reasonable inquiry would not have led

21

him to the discovery of his injury, *i.e.,* distributions in breach of his agreement with Elkin. Rather, based on the facts as found by the jury, he would have learned that Elkin was repaying himself the excess capital he had contributed, which was not a violation of the agreement. Elkin cites nothing in the record that transpired or could have come to light between such an investigation and November 2001, the outside limitations date for Norman's breach of contract claim,[12] that should have prompted Norman to investigate further, and would have led to the discovery of the violative distributions.

For that same reason, Elkin's argument that it is not appropriate to simply disregard what Norman knew or should have known prior to the date of his injury for inquiry notice purposes misses the mark. Assuming the correctness of Elkin's dubious premise that one can be on inquiry notice of an injury that has not yet occurred, his argument nevertheless does not hold water because it fails to account for the fact that, at least in this case, reasonable inquiry into facts known to him before his injury would have led to Norman discovering conduct – the repayment of loans – that did not violate his right

_____

[12] Because the District Court concluded that the statute of limitations for Norman's claims was tolled from November 2004 (when Norman commenced the §220 Action) through his filing of this lawsuit, and because Norman's breach of contract claim has a three-year limitations period, the District Court viewed the operative question in determining whether Norman's breach of contract claim was time-barred as being whether he had at least inquiry notice of that claim before November 2001, *i.e.,* three years before the start of the §220 Action. *Norman VI*, 338 F. Supp. 3d at 375. We agree with that approach.

22

to a *pro rata* share of USM's distributions. And that discovery would have terminated Norman's obligation to inquire further on that issue absent new information. Accordingly, we will reverse the District Court's dismissal of Norman's distribution-based breach of contract claim based on the May, July, and August 2001 distributions, and will remand for the Court to restore in full the second jury's $73,180.17 compensatory damages award for Norman's distribution-based breach of contract claim.[13]

## 2. Non-contract claims

Norman contends that the District Court erred in dismissing his conversion and breach of fiduciary duty claims as untimely. Regarding his conversion claim, Norman argues that the District Court erred in concluding that claim accrued when Elkin registered TEG as the applicant or owner of the Phase II licenses, and not in 2000 and 2001 when "USM was damaged by the failure of Elkin to deposit the Phase II license sale proceeds into USM," because that was the point at which TEG's control over the licenses was "unauthorized." (Norman Answering Br. at 58-59; *see also Norman VI,* 338 F.Supp.3d at 376.) Norman's position before us, however, is irreconcilable with the conversion claim he actually tried to the jury, which was clearly based on the theory that TEG's initial procurement of the Phase II licenses was unauthorized. (*See* JA 725 (verdict question for Norman's "Conversion and Misappropriation Claim" stating "Do you find … that … Elkin misappropriated [USM]'s good will or status as a qualified bidder and

---

[13]   Per our conclusion herein, we leave to the District Court any recalculation of interest included in the judgment, as necessitated by that restoration.

23

incumbent license holder with the Federal Communications Commission during the 220 MHz Auction Number 18?"); JA 719 (jury instructions for Norman's conversion claim explaining elements as "1. [USM] possessed the status as a qualified bidder and incumbent license holder before the Federal Communications Commission; 2. [Elkin] or [TEG] exercised control over that status; 3. The exercise of the control was unauthorized; 4. [USM] was harmed as a result of the conduct.")). We find no error in the District Court's determination that Norman had inquiry notice of TEG's "unauthorized" procurement of Phase II licenses before November 2002, the outside limitations date for his non-contract claims.[14] That inquiry notice was a product of the numerous public disclosures regarding TEG's procurement of Phase II licenses, Norman's close monitoring of the Phase II auction, his failure to follow up with Elkin after Elkin declined to provide him requested information about the auction results, and Elkin's disclosure during the Summer 2002 Call that licenses had been sold and distributions made. Any of those events should have prompted Norman to inquire further, and reasonable inquiry would have led to the discovery that TEG had procured Phase II licenses at USM's expense. Accordingly, the District Court properly dismissed Norman's conversion claim as untimely.

---

[14] The District Court's analysis of the timeliness of Norman's non-contract claims was similar to its analysis of his contract claim, except November 2002, two years before the §220 Action was filed, was the key date because of the two-year statute of limitations for those claims. *Norman VI*, 338 F. Supp. 3d at 377-78. We again agree with the framework the District Court utilized to decide the timeliness issue.

24

Importantly, even if Norman was correct that his conversion claim did not accrue until 2000 or perhaps 2001, that claim's disposition would remain unchanged. The evidence in this case shows that the Summer 2002 Call alone placed Norman on inquiry notice. That call, during which Elkin was "evasive" and made the clearly disturbing statement that Norman did not receive any distribution from USM's asset divestitures because it was not "his turn," correctly prompted Norman to investigate further and seek additional information.[15] In the case of Norman's conversion claim, we need not even infer what discoveries a reasonable investigation would have yielded. The record shows Norman's straight-forward request for more information in fact led to, among other things, the December 2002 Letter, which identified TEG as the holder of Phase II licenses that he believed belonged to USM. Therefore, Norman had inquiry notice of his conversion claim by November 2002 because evidence of TEG's alleged wrongdoing could have been discovered, and was in fact discovered, through a reasonable investigation of the suspicious distributions that he actually became aware of during the Summer 2002 Call.[16] *See U.S. Cellular Inv. Co. of Allentown v. Bell Atl. Mobile Sys., Inc.*, 677 A.2d 497, 503 n.7

---

[15] Of course, Elkin's initial failure to respond to this request only heightened the need for investigation, as demonstrated by the fact that the failure galvanized Norman to seek the assistance of counsel.

[16] To be clear, we are not holding that the source of Norman's inquiry notice was the December 2002 Letter. Rather, we cite that communication as compelling evidence of what discoveries a reasonable inquiry initiated in response to the Summer 2002 Call would and did yield.

25

(Del. 1996) ("[T]he federal doctrine means limitation and laches does not begin to run until evidence of [the alleged wrong] is discovered or could have been discovered had reasonable diligence been exercised, for whatever is notice calling for inquiry is notice of everything to which such inquiry might have led.") (quoting *Tobacco & Allied Stocks, Inc. v. Transamerica Corp.*, 143 F. Supp. 323, 328–29 (D. Del. 1956)).

As to his breach of fiduciary duty claim based on the execution of the SLA, Norman says the District Court was wrong to conclude the claim was time-barred, given both our holding in *Norman V* reinstating his SLA-based breach of contract claim and the Court's reliance on USM's financial information from 1998. First, as already noted, Elkin failed to challenge the timeliness of Norman's SLA-based breach of contract claim. Thus, the fact that judgment was entered in Norman's favor on that claim says nothing about the timeliness of his SLA-based breach of fiduciary duty claim. Second, even if we agreed with Norman that our holding in *Norman V* somehow forecloses the possibility that he had inquiry notice of his SLA-related claims in 1998, it is evident that the Summer 2002 Call provided such notice. Elkin's statement during the call that it was not Norman's "turn" to participate in the Company's distributions undoubtedly should have prompted Norman, USM's only other stockholder, to investigate the Company's capital structure and understand the basis for that statement. And, in fact, he did. The October 2002 Letter specifically sought information "about the sale or other disposition" of any USM stock or assets over the prior three years, and the uses of any proceeds from those sales, which led to Norman receiving a copy of the SLA in October 2003 and

26

notice that stockholder loans were being repaid.[17] *Norman VI*, 338 F. Supp. 3d at 370. Accordingly, and exactly as with his conversion claim, Norman had inquiry notice of his SLA breach of fiduciary duty claim by November 2002 because Elkin's alleged breach could have been discovered, and was in fact discovered, through a reasonable investigation of the troubling statements Elkin made during the Summer 2002 Call.[18]

---

[17] Again, to be clear, we are not holding that the source of Norman's inquiry notice was the October 2003 Letter. We rely on that letter only as evidence of what discoveries a reasonable inquiry initiated in response to the Summer 2002 Call would have yielded.

[18] Norman argues that we should essentially ignore the Summer 2002 Call because certain statements made by Elkin in his briefing "are an explicit withdraw [sic] or waiver of his past arguments that the Summer 2002 Call could have provided Norman with notice of certain claims." (Norman Reply Br. at 5.) Read in their proper context, however, it is clear that Elkin's statements regarding his lack of reliance on the Summer 2002 Call to demonstrate Norman's inquiry notice pertain only to Norman's breach of contract claim. That is unsurprising, given those claims have a three-year limitations period and the Summer 2002 Call occurred less than three years before Norman initiated the §220 Action. Elkin did not, *sua sponte*, abandon the most compelling – and largely dispositive – evidence in the record on the question of when Norman had inquiry notice of his non-contract claims.

Third, Norman asserts that the District Court applied the wrong standard to assess inquiry notice, based on the Court's statement that Norman knew "enough to put him <u>on notice of the need to undertake further inquiry</u> to determine if Elkin had wronged him." (Norman Answering Br. at 60 (quoting *Norman VI*, 338 F. Supp. 3d at 375).) According to Norman, the correct standard "is whether the allegedly notice-providing evidence would objectively lead to the discovery of Norman's <u>actual injury</u>." (*Id.* at 61.) But that argument ignores that the standard the District Court actually applied throughout its opinions is exactly the standard Norman advocates. A mere one sentence later than the language Norman criticizes, the Court held that "[i]f Norman had [undertaken further inquiry], he would have discovered Elkin's allegedly improper distributions." *Norman VI*, 338 F. Supp. 3d at 375. Thus, it is clear that the District Court considered it significant that Norman knew enough information to warrant further investigation, not for its own sake, but because such further investigation would have led to the discovery of Norman's actual injury. That analysis, which the Court utilized throughout its opinion,[19] applies the correct standard. *See Pomeranz v. Museum Partners, L.P.*, No. CIV. A. 20211, 2005 WL 217039, at \*3 (Del. Ch. Jan. 24, 2005) ("Inquiry notice does not require full knowledge of the material facts; rather, plaintiffs are on inquiry notice when they have sufficient knowledge to raise their suspicions to the point where persons

---

[19] *See, e.g., Norman VI*, 338 F. Supp. 3d at 377 (conversion claim time-barred because reasonable investigation would have led to discovery of the injury); *id.* at 379 (same regarding SLA-based breach of fiduciary duty claim).

28

of ordinary intelligence and prudence would commence an investigation that, if pursued would lead to the discovery of the injury.").[20]  Norman's position to the contrary is meritless.

Finally, Norman says that the District Court did not properly consider the so-called "smoking gun" standard applicable to determining inquiry notice for claims involving fiduciaries.  That argument also is unpersuasive.  We have previously recognized that, under Pennsylvania law, "the existence of a fiduciary relationship is relevant to a discovery rule analysis precisely because it entails such a presumptive level of trust in the fiduciary by the principal that it may take a 'smoking gun' to excite searching inquiry on the principal's part into its fiduciary's behavior." *In re Mushroom Transp. Co.*, 382 F.3d 325, 343 (3d Cir. 2004).  Assuming Elkin had the burden of producing a "smoking gun" that should have prompted Norman to inquire into potential wrongdoing, we are satisfied he carried that burden here.  By Norman's own account, Elkin was "evasive" during the Summer 2002 Call, which itself should have greatly troubled him, especially since the reason he reached out to Elkin in the first place was that he had not heard from him "in ages."  (Norman Answering Br. at 13; JA 860.)  The substance of the call, in which Elkin

---

[20]  The District Court determined long ago that Norman's non-contract claims were governed by Pennsylvania law. *Norman I*, 2007 WL 2822798, at *4.  But both the District Court's analysis and the parties' briefing often rely on Delaware case law.  Given the absence of any argument from the parties that Delaware and Pennsylvania law have meaningfully different definitions of inquiry notice, we will follow their lead and assume, without deciding, that the two laws are comparable in that regard.

acknowledged that licenses had been sold and that he alone had taken distributions, without any direct notice to Norman, should have been at least equally alarming, particularly given Norman's own admission that Elkin had a "checkered" history in dealing with him. (Norman Answering Br. at 61.) Indeed, there was no readily apparent reason that Norman, who understood himself to be one of only two stockholders holding the same class of common stock as Elkin, would need to wait for "his turn" to receive a distribution.[21] And if that were not enough, Norman simply ignores that he, in fact, was sufficiently disturbed by the Summer 2002 Call that it prompted him to investigate further.[22] Therefore, at a minimum, the conclusion that the Summer 2002 Call placed Noman on inquiry notice is consistent with Pennsylvania's "smoking gun" standard. Because the Summer 2002 Call placed Norman on inquiry notice of all of his non-contract

---

[21] Norman makes much of the fact that any Form K-1's he received did not identify that USM had any stockholder loans. However, the omission of any stockholder loans from USM's Form K-1's, whether deliberate or inadvertent, should only have served to heighten Norman's suspicions as to why he was not receiving any distributions given the apparent lack of more senior securities in USM's capital structure.

[22] Elkin's ignoring Norman's well-founded requests for additional information to the point that Norman felt it necessary to enlist the assistance of counsel only underscores how patently unreasonable it would have been for him to continue to rely on the fiduciary nature of his relationship with Elkin as a justification for not investigating Elkin's potential wrongdoing.

claims,[23] the District Court properly dismissed them as barred by the statute of limitations.

## III. CONCLUSION

For the foregoing reasons, we will reverse the District Court's dismissal of Norman's distribution-based breach of contract claim for the distributions that occurred in May, July, and August of 2001. In all other respects, we will affirm the District Court's final order. Accordingly, we will remand this case to the District Court for the limited purpose of entering a further revised final judgment, which revisions to the District Court's Revised Final Judgement in a Civil Case dated May 7, 2019 shall be: (i) recalculating the damages amounts specified in the first paragraph and paragraph 1(b) to reflect Norman's prevailing on his breach of contract claim based on Elkin's failure to make *pro rata* distributions in May, July, and August 2001; (ii) otherwise revising paragraphs 1(b) and 2(a) to reflect Norman's prevailing on his breach of contract claim based on Elkin's failure to make *pro rata* distributions in May, July, and August 2001; and (iii) identifying the proper rate of post-judgment interest.

---

[23] This includes Norman's claims for usurpation of corporate opportunities, breach of the duty of disclosure, unjust enrichment, and declaratory judgment.